IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

IN RE:

INTEGRAS PROPERTY
MANAGEMENT, INC.

        DEBTOR.                       CASE NO. :  11-40051
                                                   Chapter 11

_____/

## MOTION TO DISMISS AND SUPPORTING MEMORANDUM

COMES NOW REGIONS BANK ("Regions"), a secured creditor, through undersigned counsel and, pursuant to 11 USC § 1112 (b), files this Motion to Dismiss and Supporting Memorandum (this "Motion to Dismiss").  In this Motion to Dismiss, Regions specifically requests that the pending bankruptcy proceeding of the Debtor, INTEGRAS PROPERTY MANAGEMENT, INC. ("the Debtor"), be dismissed for cause, and that the Debtor be prohibited for two years from filing for protection under the Bankruptcy Code.

Regions is filing this Motion to Dismiss this Chapter 11 bankruptcy proceeding for cause, as permitted by 11 U.S.C. §1112(b)(4).  The cause is generally described as follows:

a)     Substantial and continued loss and diminution of the estate, and absence of a reasonable likelihood of rehabilitation; and

b)     Bad faith, because this is a two party dispute and the Debtor filed its petition in bankruptcy in bad faith, solely to delay the foreclosure sale which Regions had scheduled in state court; and

c)     Bad faith, as evidenced by the Debtor's flagrant disregard for the proper completion of its Schedules and Statement of Financial Affairs ("SOFA"), which were filed two weeks after the Debtor filed its petition in bankruptcy, and which remain uncorrected as of the morning of March 14, 2011, which is the date this Motion is being completed.

**OVERVIEW**

The Debtor is a single asset entity that owns and leases an assisted living facility and related real property. The Debtor ceased operations in 2008, has failed to generate any revenue since 2008, and had absolutely no income as of the date it filed its petition in bankruptcy. Regions holds a mortgage and final judgment which encumber all of the Debtor's real estate. Regions previously paid all ad valorem taxes due on the real property for 2007, 2008 and 2009, so the Debtor has not previously taken any action to protects its real property. On December 13, 2010, Regions obtained its final judgment of $2,561,524.57 against the Debtor, and scheduled a foreclosure sale for January 27, 2011. Within an hour of the scheduled foreclosure sale, the Debtor filed this petition in bankruptcy. The petition in bankruptcy was filed in bad faith, upon information and belief, in an effort to protect certain licenses and interests owned by the Debtor's affiliated companies. Nonetheless, this bankruptcy is a two-party dispute that was filed in bad faith, and the Debtor has no chance of a successful reorganization or rehabilitation. Accordingly, Regions moves for dismissal, pursuant to Section 1112(b).

**PERTINENT FACTS**

1) The Debtor is a single asset entity, which filed a bankruptcy petition on January 27, 2011 – moments before a scheduled foreclosure sale. *See page 63, lines 11-15 of Transcript of Debtor's 341 Hearing, attached hereto as Exhibit "A" (hereinafter the "341 Transcript").* The Debtor leases and manages real property.

2) Regions previously extended multiple loans to the Debtor and various affiliated parties. The Debtor's real property was collateral to secure these loans. On December 13, 2010, the Circuit Court in and for Gulf County, Florida entered a Final Judgment in Favor of Regions Bank and Final Judgment of Foreclosure, a copy of which is attached hereto as Exhibit "B" (hereinafter the "Final Judgment"). The Final Judgment was never appealed, so it is now a final non-appealable judgment.

3) Pursuant to the Final Judgment, as of the date it filed its petition in bankruptcy (Jan 27, 2011), Regions owed the Debtor $2,561,524.57, as set forth below:

|          | Judgment Total | Int. thru 12/13/2010 | Int. through 1/27/11 | TOTAL |
|----------|---------------:|---------------------:|---------------------:|------:|
| Note #1  | $ 797,673.36   | $ 16,781.85          | $ 113,800.59         | $ 928,255.80 |
| Note #2  | $ 700,236.72   | $ 15,040.80          | $ 99,942.89          | $ 815,220.41 |
| Note #3  | $ 187,843.39   | $ 4,034.70           | $ 26,810.36          | $ 218,688.45 |
| Note 3A  | $ 61,512.23    | $ 1,311.75           | $ 8,778.15           | $ 71,602.13 |
| Note #4  | $ 67,132.27    | $ 1,437.30           | $ 9,580.95           | $ 78,150.52 |
| Note #5  | $ 383,791.78   | $ 8,236.35           | $ 54,776.53          | $ 446,804.66 |
| Note #6  | $ 2,448.66     | $ 10.35              | $ 343.59             | $ 2,802.60 |
| TOTAL    | $ 2,200,638.41 |                      |                      | $ 2,561,524.57 |

4) The Final Judgment establishes that the Debtor has not paid its ad valorem property taxes on the real property since 2007. *See paragraph 5, page 5 of Final Judgment attached as Exhibit "B", which sets forth Regions right to collect for the past due ad valorem taxes paid by Regions..*

5) Under the Final Judgment, Regions was entitled to foreclose upon all of the real property owned by the Debtor and subject to mortgages in favor of Regions. The Debtor's real property includes four parcels of property which are generally described follows:

   a) The Assisted Living Facility;

   b) The Medical Office Building;

   c) An A-Frame House on Highway 98; and

   d) A Vacant Lot in Beacon-by-the Sea.

6) Approximately twenty (20) minutes prior to a foreclosure sale conducted in accordance with the Final Judgment, the Debtor filed its petition in bankruptcy.

7) The Debtor has no employees. *See page 44, lines 6-9 of 341 Transcript.*

8) The Debtor ceased operations in 2008, because the Debtor's real property (which is mortgaged to Regions) has been "basically dormant" since 2008, has had no activity, and has not generated any revenue or expenditures. *See page 18, lines 3-15 of 341 Transcript.* The Debtor confirmed that has had no operations since 2008. *See page 21, lines 13-20 of 341*

*Transcript.* Moreover, the Debtor had no income as of March 2, 2011. *See page 49 lines 13-24 of 341 Transcript.*

9) Not only has the Debtor ceased operations, but it made a conscious decision to cease its operations when the economy changed. Specifically, the Debtor decided to consolidate its assisted living facilities, and it moved residents to an assisted living facility owned by an affiliated corporation (owned by some of same principals that own the Debtor), which left the Debtor's buildings without a revenue stream. *See page 24, lines 1-14 of 341 Transcript.* Therefore, the principals of the Debtor made a conscious decision to halt the Debtor's operations.

10) The Debtor's Bankruptcy Schedules and Statement of Financial Affairs ("SOFA") reflect the following:

    a) According to Schedule A, the Debtor only owns three properties, which have a value of $830,000. For some reason, the Schedules state that the Debtor did not know the amount of the secured claim, which is more than $2,500,000 owed to Regions as set forth in the Final Judgment rendered the month prior to the bankruptcy filing. *See Schedule A, page 3 of 21 of Debtor's Schedules, Doc. #23 (hereinafter "Schedules").*

    b) The Debtor's Schedules failed to list its assisted living facility on its list of real property.[1] Instead of listing this real property, the Debtor identified on Schedule B that it owns and operates an assisted living facility. *See Schedules, page 5 of 21.*

    c) Accordingly to Schedule B, the Debtor had $00.00 cash on the day it filed its petition in bankruptcy, and it had no other personal property, except:

        i. stock in an assisted living facility;

        ii. a 2005 Ford E-350 Van; and

        iii. miscellaneous office equipment worth $2,500.

---

[1] At its 341 meeting, the Debtor indicated it would amend its schedules, but as of the date of filing of this Motion to Dismiss, no amendment has been filed.

4

*See Schedules, pages 5-6 of 21.* Yet, at the 341 Meet, the Debtor testified that it had cash, in an amount less than $1,000, at Peoples South when it filed its petition in bankruptcy. *See page 45, lines 8-11 of 341 Transcript.*

      d)      Accordingly to Schedule D, Regions Bank is the Debtor's only secured creditor. *See Schedules, page 7 of 21.*

      e)      Accordingly to Schedule E, the Debtor has no creditors holding unsecured priority claims. *See Schedules, page 9 of 21.*

      f)      Accordingly to Schedule F, Regions Bank and Superior Bank are the Debtor's only unsecured creditors. *See Schedules, page 9 of 21.*

      g)      According to Schedule G, the Debtor has no executory contracts or unexpired leases. *See Schedules, page 10 of 21.*

      h)      Accordingly to No. 1 of the SOFA (which is included in the Schedules that are filed as Document 23), the Debtor did not earn any income from the operation of its business in 2010 or 2011. *See Schedules, page 13 of 21.*

      i)      Accordingly to No. 2 of the SOFA, the only other income received by the Debtor in 2010 was $19,144.05 in rental income. *See Schedules, page 14 of 21.*

      j)      According to No. 18 of the SOFA, the Debtor owns and operates an assisted living facility. Yet, at the 341 Meeting of Creditors (the "341 Meeting"), the Debtor clarified that it was merely a single asset real estate company that leased real property, with one of the properties for lease being the assisted living facility. *See Schedules, page 18 of 21.*

11)      At its 341 Meeting, the Debtor testified that no changes, corrections or modifications were required to make its Schedules and SOFA accurate. *See page 5, lines 20-24 of 341 Transcript.* Yet, at the 341 Meeting, the Debtor testified:

      a)      The Debtor is strictly a property and facilities management corporation, and has no linkage to healthcare operations, even though Schedule B and No. 18 of the SOFA

5

indicate it owns and operates an assisted living facility. *See page 6, lines 12-14 and page 15, lines 12-15 of 341 Transcript.*

b)   The Debtor acknowledged that Regions has a lien on its real property, even though the secured claim is not reflected on Schedule A. *See page 12, lines 6-13 of 341 Transcript.*

c)   The Debtor acknowledged that it failed to list the assisted living facility on Schedule A. *See page 36, lines 8-22 of 341 Transcript.*

d)   The Debtor represented that Geri-Care Assisted Living Facility ("Geri-Care"), which is affiliated with the principals of the Debtor, has the licenses to operate the assisted living facility owned by the Debtor. Yet, the Schedules do not list any type of written or oral agreement with Geri-Care regarding the arrangement for Geri Care to use the Debtor's assisted living facility. *See page 34, lines 3-18 of 341 Transcript.*

e)   The Debtor testified that there is a lease, or verbal agreement, with "the management company" to manage the assisted living facility, so the management company is paying utilities on the assisted living facility. *See page 51, lines 8-25 of 341 Transcript.* Yet, the Schedules do not mention this agreement. Apparently, the management company is responsible for paying operating costs relating to the assisted living facility, but the Schedules do not mention or disclose, in any way, this obligation. *See page 53, lines 1-11 of 341 Transcript.*

f)   The Debtor also testified that Geri-Care had a lease for the Debtor's property, and it holds the licenses and has operated the assisted living facility since. *See page 60, lines 18-25 of 341 Transcript.* Geri-Care is now operating the building on a verbal agreement – which is never mentioned in the Schedules. *See page 61, lines 1-13 of 341 Transcript.*

g)   The Debtor failed to list the tax collector as a secured creditor for 2010 ad valorem taxes *See page 55, lines 8-14 of 341 Transcript.*

6

        h)     The Debtor failed to disclose that Superior Bank commenced litigation against the Debtor to collect on its debt. . *See page 74, lines 9-14 of 341 Transcript.*

        i)     The Debtor failed to identify its officers and directors that owned more than 5% of the company. Yet, the Debtor testified that 3 individuals owned 100% of the company, with all parties owning at least 10% of the Debtor. *See page 76, lines 1-7 of 341 Transcript.*

12)    The Debtor failed to file its first operating report, which was for the period from January 27 through January 31, 2011. Yet, at the 341 Meeting, there was testimony that counsel for the Debtor had the first operating report and it showed "absolutely nothing" except an $8.00 charge on a bank statement. *See page 21, lines 1-7 of 341 Transcript.* This unfiled operating report demonstrates that the Debtor does not have an operating business.

13)    The Debtor testified that its plan of reorganization has two potential options: i) the sale of its real property to a third party; or ii) a lease to Geri-Care, which is an entity affiliated with the principals of the Debtor, which would then lease the facility to Better Senior Living. *See page 32, lines 13-25, and page 33, lines 1-24 of 341 Transcript.*

14)    Under the lease arrangement:

        a)     Better Senior Living would lease the building from the Debtor, and would lease the licenses from Geri-Care (the entity owned by the principals of the Debtor). *See page 34, lines 3-18 of 341 Transcript.* In other words, the arrangement to lease the facility would directly benefit the principals of the Debtor, because the licenses for the Debtor's facility would also be leased to Better Senior Living.[2]

        b)     Better Senior Living would lease the building for approximately $10,000 per month to the Debtor. *See page 34, lines 19-25 and page 35, lines 20-24 of 341 Transcript.*

---

[2] Upon information and belief, the affiliated licenses are the motivation for the Debtor to stall Regions foreclosure sale, because once the Debtor's property is sold, the licenses held by the affiliated entity (Geri-Care) will not have any value.

Additionally, the Debtor would try and lease the other properties. However, no proposed lease has been drafted or is available for review.

        c)      The Debtor represented that the fair market value of its mortgaged property was between $1,300,000 to $1,700,000, so debt service to Regions will be approximately $8,500 per month under the proposed lease. *See page 38, lines 19-23 of 341 Transcript.*

## LAW AND ARGUMENT

**Estate is Losing Value and Rehabilitation is Not Possible**

15) The purpose of a Chapter 11 reorganization is to help financially distressed businesses by providing them with breathing space to return to a viable state. *In Re Clawson Medical Rehabilitation and Pain Care Center, Inc.,* 815 F.2d 702 (6th Cir. 1987). If a debtor does not have a potentially viable business in place which is worthy of protection and rehabilitation, the Chapter 11 has lost is "*raison d'etre". Citing In re Ironsides, Inc.*, 34 B.R. 337, 339 (Bankr. W. D. Ky. 1983). *Id at 702.* When a business ceases all of its operations before filing a Chapter 11, any basis for projecting a successful reorganization is removed. *Id.*

16) In the instant case, the Debtor ceased operations in 2008, when it closed down its assisted living facility, and failed to subsequently lease its property to generate revenue. The Debtor has only received approximately $20,000 in income since 2009. Therefore, the Debtor had already ceased operations by the time it filed bankruptcy on January 27, 2011. *In re Great American Pyramid Joint Venture,* 144 B.R. 780, 791 (Bankr. W.D. Tn. 1992) (where no or substantially no business is left to reorganize, Chapter 11 cases do not serve those purposes and "cause" exists).

17) The Debtor has not been able to lease its properties prior to its bankruptcy filing, so the Debtor has no reason to believe it can now lease its properties. *See also In re Orienta Cooperative Association,* 256 B.R. 508 (Bankr. W.D. Okl. 2000) (even though it was relatively

early in the proceeding, the debtor's hopes for reorganizing are likely to remain speculative and contingent, so the case was converted to a chapter 7).

18) Even if the Debtor could lease its properties, it is not going to generate sufficient income to provide adequate protection to Regions. The Debtor hopes to lease its real property to Better Senior Living Facility, for $10,000 per month. Yet, even if the Debtor is able to receive $10,000 per month in rental income, that is not sufficient to pay basic operating expenses, because:

    a) The 2010 ad valorem taxes, estimated at $20,000, remain unpaid. *See Exhibit "C" attached hereto, which constitutes the tax bills relating to the mortgaged property.*[3]

    b) Interest only payments on the $2,561,524.57 owed to Regions is $12,632.18 per month, assuming each month is 30 days and interest accrued only at 6% per annum. Therefore, the entire estimated lease payment of $10,000 per month is not sufficient to adequately protect Regions.[4]

19) While the Debtor attempts to earn income by re-commencing its business, Regions will be prejudiced during this period of time. Specifically:

    a) The continued interest accruing on the 2010 ad valorem taxes causes prejudice to Regions as those taxes continue to increase, and they prime Regions' mortgage.

    b) The A-frame house which is owned by the Debtor and is mortgaged to Regions has roof damage, and it remains unoccupied due to the roof damage. *See page 11, lines 6-11 of 341 Transcript.*

    c) The Debtor's own estimate is that the maximum amount of its real property is $1,700,000, compare to Region's Final Judgment of more than $2,500,000.

---

[3] The tax collector's office has two of these properties listed in the name of affiliated entities, but these are the Debtor's real property, per the records of Regions.

[4] Regions also suspects that any management company is going to also pay Geri-Care monthly rent for the use of its licenses. Therefore, no one knows the true extent of the anticipated lease of the mortgaged assisted living facility.

Due to its speculative limited income:[5] the Debtor will not be able to satisfy its monthly obligations, and Regions will be prejudiced by the amount owed for ad valorem taxes continuing to increase, and by the continued damage to the A-frame house.

20)    The Debtor's chances of reorganizing are speculative at best, since the Debtor has not been able to lease its properties since 2008.  Yet, even if the Debtor is able to get its proposed tenant, the proposed tenant will only generate a maximum of $10,000 per month to the Debtor, and that amount is not sufficient to provide adequate protection to Regions.

**Bad Faith:**

21)    Section 1112(b) provides that a bankruptcy proceeding can be dismissed for cause. "Cause" exists to dismiss a bankruptcy petition when the bankruptcy petition has been filed in bad faith. *Singer Furniture Acquisition Corp., v. SSMC Inc. N.V.*, 254 B.R. 46, 51 (Bankr. M.D. Fla. 2000).  The court has discretion to evaluate the totality of the circumstances in each case and determine whether those circumstances indicate a bad faith filing by a certain debtor. *Id.* at 51.  Bad faith is found when the totality of the facts demonstrates that the use of the bankruptcy laws is inappropriate. *In re Forest Hills,* 364 B.R. 808, 820 (Bankr. E.D. Okla. 2007).  A bad faith inquiry reveals whether the Debtor's real motivation is to abuse the reorganization process and to cause hardship or delay creditors merely for the purpose of invoking the automatic stay, without any intent or ability to reorganize its business. *Singer*, 254 B.R. at 52.

22)    The Debtor filed this bankruptcy proceeding solely to delay the foreclosure of its real estate so it can make one last attempt to locate a purchaser or lessee of the property.  If the Debtor cannot sell or lease its real property, then its affiliated entity, Geri-Care (which has licenses relating to the real property), will not receive any income or benefit from the licenses.

---

[5]  The Debtor's hope of income is still totally speculative, because the Debtor lacks a proposed final lease that has been negotiated with the prospective tenant. If a lease had been possible, then surely the Debtor would have executed that lease prior to the state court foreclosure action.  Yet, for purposes of this Motion, Regions is assuming that the Debtor can lease the property for the $10,000 per month.  This monthly lease payment is not sufficient to pay Regions' adequate protection, pay the 2010 and future ad valorem taxes, or fix the A-Frame House.

Therefore, the Debtor's goal in this bankruptcy reorganization is to re-commence its business, which it previously ceased operating, as evidenced by the fact that Regions is one of two creditors in this bankruptcy proceeding.

23) The Debtor does not have any employees, and it did not have a dime in its bank account, on the date of its bankruptcy filing—accordingly to its Schedules.

24) This bankruptcy petition was filed in bad faith because: it is a two party dispute between the Debtor and Regions, and the Debtor's filing of its Schedules and SOFA confirm that the Debtor made little effort to accurately complete its Schedules and SOFA. The Debtor has virtually no assets available to other creditors, as its real property is subject to Regions' mortgage.

Two Party Dispute

25) Where a debtor's reorganization is essentially a two party dispute which can be resolved outside the bankruptcy court, and the purpose of the filing is to frustrate a creditor's remedies, it has been held that the petition was not filed in good faith. *See In re Albany Partners, Ltd.,* 749 F.2d 670, 674 (11th Cir. 1984); *In re Noco, Inc.,* 76 B.R. 839, 844 (Bankr. N.D. Fla. 1987); *In re Sar-Manco, Inc.,* 70 B.R. 132, 141-142 (Bankr. M.D. Fla. 1986) (when mortgage had been reduced to final judgment, and debtor had no ability to satisfy final judgment prior to 4-10 years, it was a two-party dispute, and the bankruptcy was dismissed); *In re Krilich,* 87 B.R. 178, 181 (Bankr.M.D.Fla.1988) (case dismissed for lack of "good faith" where controversy basically involved two parties, *i.e.,* debtor and secured creditor).

26) Moreover, it is compelling evidence that a bankruptcy petition is the result of a two-party dispute, when a debtor faces no threats from any other creditors. *In re State Street Houses, Inc.,* 305 B.R. 726, 736 (Bankr. S. D. Fla. 2002). In such instances, the bankruptcy proceeding should be dismissed. *Id.* at 736-737. *See also In re Campus Housing Developers, Inc.,* 124 B.R. 867 (Bankr. N. D. Fla. 1991) (dismissed bankruptcy for bad faith filing when it was clear that the matter was a two party dispute that had already been litigated in state court).

27) There is no single test for determining whether a debtor has filed a petition in bad faith. *In re Phoenix Piccadilly, Ltd.,* 849 F.2d 1393, 1394 (11th Cir. Fla. 1988). Instead courts may consider any factors which evidence "an intent to abuse the judicial process and the purposes of the reorganization provisions". *Id.* at 1394. *See also In re Gooding,* 234 B.R. 157 (Bankr. M.D. Fla. 1999) (dismissed for bad faith because it was a two party dispute, and was merely a litigation strategy).

28) Using the analysis in *Phoenix Piccadilly, Ltd.,* the following factors should be considered in the instant bankruptcy, to evidence the Debtor's bad faith:

    a) The Debtor has only two creditors: Regions and one unsecured creditor.

    b) The Debtor has no employees.

    c) The Debtor's real property is the subject of a foreclosure action, due to the Debtor's failure to satisfy the amounts due under the loans, as confirmed in the Final Judgment.

    d) The Debtor's financial problems involve a dispute between the Debtor and its secured creditor which can be resolved in the pending state court action.

    e) The timing of the Debtor's bankruptcy filing, within an hour of the foreclosure sale, evidences an intent to delay or frustrate the legitimate efforts of the Debtor's secured creditor to enforce its rights.

*See Phoenix Piccadilly, Ltd.,* 849 F.2d 1393, 1394 (11th Cir. Fla. 1988).

29) The Debtor has not operated its business, and has not leased its assisted living facility since 2008. Yet, when a foreclosure sale was scheduled for January 29, 2011, the Debtor felt entitled to file a petition in bankruptcy to halt the foreclosure, and to allow the Debtor one last chance to lease the assisted living facility and/or to sell the facility – along with the licenses owned by an affiliated entity. The Debtor's last minute action, in an effort to save its final asset, demonstrates its bad faith.

30) The facts of this case demonstrate that this is a two party dispute and the Debtor is abusing the bankruptcy process by attempting to reorganize a business which it shut down more than two years ago.

Inaccurate Disclosure

31) Not only does this case involve a two party dispute, but the Debtor's handling of its Schedules and SOFA demonstrate a complete and total disregard for the Debtor's need to accurately and completely disclose its financial status.

32) The Debtor's Schedules and SOFA include numerous inaccuracies that were admitted during the 341 meeting, which was held on March 2, 2011. Yet, the Debtor has failed to correct the numerous inaccuracies which are set forth in paragraph 11 above.[6]

33) Upon information and belief, even the Debtor knows that it will not be able to file a plan of reorganization. The real intent and purpose of the bankruptcy filing was to allow the Debtor additional time to try and find a buyer of the property. The Debtor was not concerned about accurately completing the financial information, as demonstrated by its inaccurate Schedules and SOFA. Accordingly, the Debtor's bankruptcy petition should be dismissed as a bad faith filing.

34) The dismissal of bad faith filings preserves the integrity of the bankruptcy process and ensures only those debtors who have filed for bankruptcy in good faith are afforded relief. *In re Reese*, 402 B.R. 43, 52 (Bankr. M.D. Fla. 2008). "[A] good faith standard protects the jurisdictional integrity of the bankruptcy courts."  *In re Mack*, 347 B.R. 911, 916 (Bankr. M.D. Fla. 2006).

---

[6] The Debtor testified that it had no idea of any problems with its Schedules and SOFA at the beginning of the 341 Meeting. The 9 problems identified in paragraph 11 above were readily apparent during the meeting. Regions suspects that many additional problems would be noted if further inquiry were conducted regarding the Debtor's financial affairs.

Dated this 14th day of March, 2011.

                                        CARVER, DARDEN, KORETZKY, TESSIER, FINN,
                                        BLOSSMAN & AREAUX, LLC

                                          By:_____/s/ Linda A. Hoffman_____
                                          Linda A. Hoffman, Esquire
                                          Florida Bar No.:  0500800
                                          Robert S. Rushing, Esquire
                                          Florida Bar No.:  0013946
                                          801 W. Romana Street – Suite A
                                          Pensacola, Florida 32502
                                          Telephone: (850) 266-2300
                                          hoffman@carverdarden.com
                                          Attorneys for REGIONS BANK

## CERTIFICATE OF SERVICE

      I HEREBY CERTIFY that a copy of the foregoing has been provided to the following via the CM/ECF electronic court system and via U. S. Mail this 14th day of March, 2011:

J. Randall Frier  
Frier & Frier, P.A.  
1682 Metropolian Circle  
Suite A  
Tallahassee, FL  32308

Jason Eagan  
Trial Attorney, U. S. Trustee  
110 E. Park Avenue  
Suite 128  
Tallahassee, FL  32301

          CARVER, DARDEN, KORETZKY, TESSIER, FINN, BLOSSMAN & AREAUX, LLC

          By:      /s/ Linda A. Hoffman  
          Linda A. Hoffman, Esquire  
          Florida Bar No.:  0500800  
          Robert S. Rushing, Esquire  
          Florida Bar No.:  0013946  
          801 W. Romana Street – Suite A  
          Pensacola, Florida 32502  
          Telephone: (850) 266-2300  
          hoffman@carverdarden.com  
          Attorneys for REGIONS BANK